McDill 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00196-CV






Texas Natural Resource Conservation Commission, Appellant



v.



Thomas P. McDill, Jr., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 93-07567, HONORABLE PETE LOWRY, JUDGE PRESIDING 







 Thomas McDill brought suit against the Texas Natural Resource Conservation
Commission (the "TNRCC") alleging discrimination in violation of the Whistleblower Act ("the
Act"). See Tex. Gov't Code Ann. §§ 554.001--.010 (West 1994 & Supp. 1996). (1) Following a
jury trial and verdict in favor of McDill, the trial court rendered judgment awarding McDill
$59,738 for lost earnings, $5,000 mental anguish damages, $746,025 exemplary damages, and
$142,000 attorney's fees, including additional amounts in the event of an unsuccessful appeal. 
The TNRCC brings numerous attacks against the judgment, including the allegation that the trial
court erred by refusing to submit a proposed jury instruction. The instruction would have required the jury to find a "but for" causal link between McDill's reports of wrongdoing and his
termination. Because we conclude that the failure to submit this instruction was error and that it
probably resulted in the rendition of an improper judgment, we will reverse the judgment of the
trial court.



Background


 McDill, a licensed professional engineer, began work in July 1990 at the Texas
Department of Health. McDill worked in the Permit Section of the Municipal Solid Waste
Division, reviewing and processing permit applications submitted by companies planning to
operate solid waste disposal facilities in Texas. In 1992, the Municipal Solid Waste Division
moved from the Health Department and became part of the Texas Water Commission (the
"TWC"). (2) McDill's responsibilities in the Permit Section of the Division remained the same at
the TWC. In March 1993, McDill was terminated. 

 In his lawsuit, McDill claimed he was fired for reporting two alleged acts of
wrongdoing which occurred within his Division: (1) the promotion of an unqualified employee,
Mary Adrian, contrary to TWC rules, and (2) the failure of McDill's supervisors to report, as
required by law, the forgery of an engineer's seal. TNRCC maintained that McDill lost his job
for committing acts of gross ethical misconduct. A full understanding of these contentions
requires a brief history of the intertwined events leading up to them.

 In September 1992, a vacancy announcement was posted in the Municipal Solid
Waste Division for the position of Permit Section Chief; the announcement listed the minimum
qualifications necessary for the job. McDill and roughly five others interviewed for the job before
a three-member panel. The panel unanimously selected Mary Adrian for the position, and she
assumed her new responsibilities in November 1992.

 As Chief, Adrian worked under the supervision of Ronald Bond, who was Director
of the Municipal Solid Waste Division. Adrian, whose duties included supervising McDill,
became concerned with McDill's work hours and punctuality during November. On December
10, 1992, Adrian interviewed McDill for a "team leader" position within the Permit Section. 
Shortly after the interview, Adrian called McDill to a second meeting to voice her concerns over
his work schedule. Bond also attended the meeting to reprimand McDill for a complaint filed by
the City of Brenham in August 1992 ("the Brenham complaint"), alleging that McDill had
scheduled a site inspection on a city holiday and had then shown up four hours late for the
inspection. 

 McDill testified he first became concerned with Adrian's qualifications for Permit
Section Chief after asking questions about her experience during the team leader interview. He
claimed that Adrian's conduct during the later reprimand meeting led him to believe she had little
experience dealing with professionals. McDill believed that neither Bond nor Adrian had
reviewed the Brenham project file before his reprimand, and testified that they were not interested
in hearing his response to the allegations. Bond and Adrian both claimed that McDill was
belligerent and unprofessional during the meeting. 

 After the meeting, McDill reviewed a copy of Adrian's resume to compare her
qualifications with those requirements listed on the vacancy announcement. According to McDill,
her resume reflected about two years' managerial experience with professionals and technicians,
while the vacancy announcement listed a minimum requirement of five to eight years' experience
in managing technical and professional personnel. On December 21, 1992, McDill met with
Adrian to bring an informal grievance over her hiring. McDill testified he told Adrian that he
believed she lacked the minimum experience for her position. According to Adrian, McDill told
her at the meeting that he would file a grievance against her for failing to warn him about his
tardiness prior to reprimanding him. Adrian claimed McDill was again obnoxious and belligerent,
an allegation McDill denied. The two met for a second time on January 4, 1993, and each
provide a similar account of the second meeting.

 Two days later Adrian met with Pete Garcia in Human Resources to discuss
possible grounds for McDill's termination. She presented Garcia with a draft memo outlining the
Brenham complaint and a second complaint against McDill made by Dick Dunham ("the Dunham
complaint"), alleging that McDill asked Dunham to submit a letter of commendation for McDill
and threatened to hold up Dunham's permit application if he failed to do so. Adrian testified that
based on these complaints and other minor instances of misconduct, she decided it was time to
terminate McDill. Garcia informed her that she did not have enough evidence to fire McDill
based on the allegations outlined in the memo.

 On January 7, Adrian received McDill's written grievance concerning her job
qualifications. The grievance complained generally of management practices, of McDill's
reprimand without prior warning, and of an "inexperienced manager" (Adrian) whose hiring did
not conform to TWC rules. (3) The grievance concluded in part that Adrian's hiring should be set
aside and the position readvertised to assure a Chief with appropriate minimum qualifications. 
In Adrian's response of January 11, she advised that McDill had not made clear which agency
rules were allegedly violated, and that his submission as written did not qualify as a grievance
under agency operating procedures. McDill appealed Adrian's decision to Bond on January 15;
in a meeting of January 25 Bond denied the appeal as untimely and agreed with Adrian that it
failed to allege a specific violation. McDill then submitted his grievance to the Grievance
Committee at Human Resources, but never received any response from the Committee. 

 While McDill was pursuing his grievance, Bond began asking various permit
applicants about possible instances of ethical misconduct on McDill's part. At a Municipal Solid
Waste Conference in late January 1993, Bond spoke with Kevin Carel of Laidlaw Corporation
about McDill's work on a Laidlaw application. Carel, who lived in Fort Worth, recalled a
telephone conversation in which McDill asked where he might find tickets to the Dallas Cowboy
playoff game. Carel had also heard rumors that McDill had asked Frank Knickerbocker, a
Laidlaw employee, to pay the college tuition for McDill's daughter. Carel stated that he had no
personal knowledge of the incident, and that Knickerbocker had left the company two years
before.

 During this same time, Adrian recalled a December 1992 conversation with Robert
Schultz concerning McDill. While they were both working at the Department of Health, Schultz
overheard McDill asking someone on the phone to send $15,000 for reducing the number of
groundwater wells required. Adrian reported this to Bond, and they both assumed McDill had
been soliciting some kind of bribe from a permit applicant. 

 In early February Bond approached James Haley, a senior manager, with the idea
of terminating McDill for poor job performance; Haley concluded there was inadequate
documentation to justify termination on that basis. Bond, Adrian and Haley met three more times
in February to discuss the allegations of ethical misconduct against McDill. Haley stated that the
allegations could support McDill's termination only if they could be confirmed by individuals with
personal knowledge of them. Bond did not further investigate the Laidlaw allegations. 

 McDill's second report of perceived wrongdoing came in February. That month,
McDill and co-worker Andy Pi noticed a forged engineer's seal affixed to a permit application
report. McDill was aware that the Engineering Practices Act required engineers to report
improperly sealed documents to the Texas State Board of Registration for Professional Engineers
("the Board"). McDill reported the forged seal to Adrian, who said she would discuss it with
Bond. At a February 23 staff meeting, Bond and Adrian instructed McDill to send the application
back to the company for correction. McDill claims he pointed out that failing to report the forged
seal amounted to a violation of state law, but the instructions remained unchanged. After the
meeting McDill and Pi reported the matter to the Board; in the next couple of days Board officials
met with McDill and Pi at the TWC. (4) According to Haley, Bond and Adrian learned about
McDill's report to the Board by March 1.

 On March 1, 1993, Bond and Haley met with McDill to tell him he was being
recommended for termination. At this meeting Haley gave McDill a memo indicating five reasons
for termination: (1) the Brenham complaint; (2) the Dunham complaint; (3) the communication
with Laidlaw regarding football tickets; (4) the request to Laidlaw regarding his daughter's
tuition; and (5) the overheard phone conversation concerning the $15,000 for reduction of
groundwater monitoring wells. The memo omitted the names of the individuals with personal
knowledge of the allegations. In a March 5 letter McDill asked for the names of his accusers and
requested a pre-termination meeting, stating that the information behind the allegations had been
gathered by the individual subjects of his grievances. He requested an independent investigation
of the charges against him. 

 Haley and Bond held a pre-termination meeting with McDill and his attorney on
March 12. At the meeting McDill reiterated the requests in his letter, to no avail. Three days
later, Haley sent a letter to McDill sustaining the decision to fire him. The letter indicated that
the football ticket allegation was the one that most concerned Haley, and that he did not rely on
the Brenham allegation in making his decision. After receiving the letter on March 24, McDill
sought review of the termination decision before a neutral grievance panel.

 According to TWC termination procedure rules, an employee can obtain a
grievance hearing on a termination by filing an appeal within ten working days of receiving the
termination letter. Alternatively, TWC grievance rules, cross-referenced in the termination
procedure rules, provide that an employee can obtain a hearing by discussing it informally with
the employee's immediate supervisor within ten days of the action giving rise to the grievance. 
If the supervisor fails to discuss the grievance within five additional working days, the employee
must then submit the grievance in writing. 

 On April 7, ten working days after receiving the termination letter, McDill left
three messages on Adrian's voice mail indicating a desire to discuss the termination. Five
working days later, McDill sent a written grievance to Adrian. Although McDill apparently
complied with the TWC grievance procedures as written, Haley denied his appeal as untimely
because the original appeal to Adrian was not in writing. Haley admitted in his testimony that the
termination procedures did not explicitly require the initial appeal to be in writing. Nevertheless,
Haley contended that the rule requiring the initial appeal to be "filed" indicated that the appeal
must be in writing, despite the fact that the termination procedures cross-referenced the grievance
rules which called for an informal initial appeal. McDill never obtained a hearing before a neutral
grievance panel. 

 After unsuccessfully pursuing other avenues to obtain the names of his accusers,
McDill filed suit against TNRCC. Material obtained through discovery provided McDill with the
names of the individuals whose information led to the allegations of ethical misconduct. At trial,
McDill convincingly disputed each of the ethical misconduct allegations.



Discussion and Holdings


 TNRCC complains in its first point of error that the jury charge did not sufficiently
set forth the causation element necessary to establish liability under the Whistleblower Act. The
Act provides that a governmental entity may not terminate an employee who reports violations of
law committed by the entity or another public employee. Tex. Gov't Code Ann. § 554.002 (West
Supp. 1996). The Act does not describe the causal link which must be proven between the report
and the termination. See Department of Human Servs. v. Hinds, 904 S.W.2d 629, 631 (Tex.
1995). 

 The court submitted the following question to the jury:



Did the Texas Water Commission terminate or otherwise discriminate against Tom
McDill for reporting in good faith one or more suspected violations of law to
appropriate law enforcement authorities?



The instructions following the question did not address the issue of causation. Thus to find
TNRCC liable, the jury was required only to find the broad causal link that McDill was
terminated "for reporting" violations of the law. TNRCC submitted the following instruction
which would have narrowed the causative element:



You are instructed that if Defendant would have taken the same action with respect
to Plaintiff without consideration of Plaintiff's "whistleblowing" activity, if any
such activity occurred, Defendant may not be held liable for any violation of the
Texas Whistleblower Act, including the retaliation referred to in these questions.



The trial court refused the instruction.

 The supreme court has recently defined the proper causation standard for
establishing liability in whistleblower cases. See Hinds, 904 S.W.2d at 631 (decided after the trial
of this case). Hinds inquired as to what role the report of illegal conduct should play in the
decision to terminate -- whether it must be the "sole reason" to terminate, a "principal reason," a
lesser but necessary factor, or one of several factors each of which could form the basis of the
decision. Id. at 632. The court initially rejected the "sole reason" standard, concluding that the
legislature would have specified that standard if it had intended to so limit causes of action under
the Act. Id. at 634.

 Hinds set forth three reasons why a "principal reason" causation standard should
not be adopted in whistleblower cases: (1) the obvious difficulty in determining what makes a
reason "principal"; (2) the Act does not seem to permit the employee's report of illegal activity
to provide any basis, however small, for the termination decision; and (3) this standard would not
adequately protect employers who harbored bad motives against an employee for making a report,
but did not act on those motives in sanctioning the employee. Id. at 635. Perhaps the most
serious deficiency of the "principal reason" standard identified in Hinds was that it could shield
from termination an employee who reports misconduct, even when other circumstances warrant
termination. An employee who reports misconduct could never be terminated even for valid
reasons because the report would inevitably play some part in any decision the supervisors made
about that employee. Id. at 636.

 Having identified so many weaknesses with the "principal reason" standard of
causation, the court formulated an alternative causation standard: "the employee's protected
conduct must be such that, without it, the employer's prohibited conduct would not have occurred
when it did." Id. Thus the court established a "but for" causal nexus requirement between the
report of misconduct and the employer's actions. 

 The Hinds jury was asked whether the Department of Human Services
discriminated against Hinds "in retaliation for his report" of alleged wrongdoing; the charge
provided no additional instruction on causation. Id. at 637. The court held that the absence of
such an instruction was error. In considering the issue, the court noted that Hinds was not entitled
to the statutory presumption that his report caused the termination. See Tex. Gov't Code Ann. §
554.004 (West 1996).

 The standard of causation employed in McDill's jury charge mirrors that rejected
by the court in Hinds. Unlike Hinds, however, McDill was entitled to the presumption that his
termination was an act of retaliation for his reports of wrongdoing. See Tex. Gov't Code Ann.
§ 554.004 (West 1996) (suspension or termination of employee within ninety days of employee's
report of illegal conduct is presumed to be in retaliation for report). McDill claims that this
distinction removes the need for the Hinds causation instruction. We disagree. The rebuttable
presumption afforded by section 554.004 does not shift the burden of proof, and can stand only
in the absence of evidence to the contrary. Garza v. City of Mission, 684 S.W.2d 148, 151-52
(Tex. App.--Corpus Christi 1984, writ dism'd). Once sufficient evidence is produced to support
a finding of the non-existence of the presumed fact, the case then proceeds as if no presumption
ever existed. Id. at 152. Evidence at trial suggesting no connection between McDill's report and
his discharge rebutted the presumption, thus McDill was required to prove a causal connection
between the report and the termination. The failure of the charge to employ the proper standard
of causation was therefore error. See Tex. R. Civ. P. 277; Hinds, 904 S.W.2d at 637. 

 For TNRCC to complain of this error on appeal, it was required to submit a
substantially correct instruction to the trial court. See Tex. R. Civ. P. 278; Hinds, 904 S.W.2d
at 637. We believe TNRCC's instruction provides a standard sufficiently similar to the one later
approved in Hinds to preserve error. TNRCC derived its instruction from Mount Healthy City
School District Board of Education v. Doyle, 429 U.S. 274 (1977), which the supreme court
relied on heavily in formulating the Hinds standard. See Hinds, 904 S.W.2d at 636. Although
TNRCC's instruction lacks a timing element, it does set forth the "but for" aspect of causation that
is central to the Hinds instruction. The proposed instruction therefore called the trial court's
attention to the causation element missing in the jury charge. See State Dep't of Highways v.
Payne, 838 S.W.2d 235, 241 (Tex. 1992) (to preserve jury charge error, party must timely and
plainly make trial court aware of complaint and obtain a ruling).

 McDill argues that TNRCC nevertheless failed to preserve error because its
proposed instruction was buried in a multitude of requests for other questions and instructions. 
See Tex. R. Civ. P. 274 (request obscured by voluminous unnecessary requests or objections will
not preserve error). TNRCC requested eleven separate instructions, most of which were only one
sentence long. We do not believe this number of requests prevented the trial court from reviewing
the substance of each individual proposed instruction. McDill further complains that TNRCC did
not give any special emphasis to the instruction at issue, but this is not required to preserve error. 
See Tex. R. Civ. P. 278. We hold that TNRCC's proposed instruction preserved error on the
issue of causation.

 The trial court's error requires reversal of the judgment only if it "was reasonably
calculated to cause and probably did cause the rendition of an improper judgment." Tex. R. App.
P. 81(b). We first consider what TNRCC's proposed instruction would have added to the jury
charge. This Court had previously determined that this instruction would have added nothing to
the jury question. See Department of Human Servs. v. Green, 855 S.W.2d 136, 150 (Tex.
App.--Austin 1993, writ denied). The Hinds court disagreed, but acknowledged that failure to
include the instruction may not have been reversible error "in the circumstances" of the Green
case. Hinds, 904 S.W.2d at 634-35. Regrettably, the supreme court did not indicate what those
extenuating circumstances were. We will therefore proceed to analyze the effect of omitting the
instruction as it relates to the holding and reasoning in Hinds.

 Hinds established that TNRCC's proposed instruction would have informed the jury
that "if the employer had sufficient legitimate grounds for taking action against the employee, it
could not be liable for the action simply because an additional ground was the employee's report
of illegal conduct." Hinds, 904 S.W.2d at 634-35. The jury found that McDill's supervisors
considered his report of misconduct in deciding to fire him. The instruction would have required
the jury to make an additional determination as to whether consideration of McDill's report was
necessary to the decision to terminate.

 Had the jury determined that TNRCC's allegations of ethical misconduct served
as sufficient, legitimate reasons to terminate McDill, it could not have found TNRCC liable just
because McDill's reports of allegedly illegal conduct were also considered in the decision-making
process. See Hinds, 904 S.W.2d at 636. The parties vigorously disputed the motivations and
factual support behind the ethical misconduct allegations. But neither the evidence nor the charge
suggests that the jury made a determination as to the validity of these misconduct allegations in
reaching the verdict that it did. Thus the jury could have concluded that the ethical misconduct
allegations provided sufficient grounds for his termination, but still found TNRCC liable for
considering the additional (and superfluous) factor of McDill's report of wrongdoing. Hinds
cannot tolerate this possibility. Accordingly we hold that the "absence of a proper causation
instruction, in these circumstances, was reasonably calculated to prevent the jury from making the
finding necessary to establish liability under the statute, thereby resulting in an improper
judgment." Hinds, 904 S.W.2d at 637. We sustain TNRCC's first point of error.

 McDill brings two cross-points of error, and asks this Court to rule on them in the
event that the judgment of the cause is reversed. Similarly, TNRCC asks us to hold that McDill
as a matter of law cannot seek exemplary damages in any future trial. Because our Constitution
forbids this Court from issuing advisory opinions, we do not reach these or any other remaining
issues. See Tex. Const. art. V, § 8; Camarena v. Employment Comm'n, 754 S.W.2d 149, 151
(Tex. 1988); Texas Parks & Wildlife Dep't v. Texas Ass'n of Bass Clubs, 622 S.W.2d 594, 596
(Tex. App.--Austin 1981, writ ref'd n.r.e.).


 Because we sustain TNRCC's first point of error, we reverse the trial court
judgment and remand the cause for a new trial.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Reversed and Remanded

Filed: January 24, 1996

Publish

1.   When appellee initiated this lawsuit in 1993, the Act was found at Texas Revised Civil
Statutes article 6252-16a. The cause of action is governed by the law in effect at that time. 
Because the recodification of the statute and subsequent changes to it have no substantive
impact on the issues relevant to our analysis, we cite the current Code provisions for the sake
of convenience. See Act of Apr. 30, 1993, 73d Leg., R.S., ch. 268, §§ 46(1), 47, 1993 Tex.
Gen. Laws 583, 986; Act of May 25, 1995, 74th Leg., R.S., ch. 721, § 11, 1995 Tex. Gen.
Laws 3812, 3814-15.
2.   After McDill was terminated, the TWC became part of the TNRCC.
3.   Although not specifically referenced in the grievance, the TWC written promotion
procedures state that employees "who meet all requirements for the higher position" are
eligible for that position; it also adopts as promotion guidelines the qualification requirements
contained in the job description.
4. In a May 1993 letter, the Board determined that the applicant had violated the Act, but
that there was insufficient evidence to conclusively prove Adrian and Bond had done so. 


were. We will therefore proceed to analyze the effect of omitting the
instruc